UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
----------------------------------------------------- x
                                                       :
NICHOLAS LORUSSO                                       :          3:19 CV 126 (RMS)
                                                       :
V.                                                     :
                                                       :
ANDREW M. SAUL, COMMISSIONER                           :
OF SOCIAL SECURITY[1]                                  :          DATE: FEBRUARY 19, 2020
                                                       :
----------------------------------------------------- x
```

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION
OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA" or "the Commissioner"]

denying the plaintiff Supplemental Security Income benefits ["SSI"].

I.       ADMINISTRATIVE PROCEEDINGS

The plaintiff filed his application for benefits on December 30, 2015, claiming that he had

been disabled since September 2, 2011, due to "[i]njuries from [a motorcycle] accident, breathing,

stutter, falls, seizure, and stomach/acid reflux." (Certified Transcript of Administrative

Proceedings, dated March 27, 2019 ["Tr."] 72-82).[2] The application was denied initially on April

6, 2016, (Tr. 95-98, 72-81), and upon reconsideration on July 26, 2016. (Tr. 104-112, 83-92). On

---

[1] The plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of Social Security. (Doc.
No. 1). On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Nancy A. Berryhill
was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Nancy A.
Berryhill as the named defendant. *See* FED. R. CIV. 25(d). The Clerk of the Court shall amend the caption in this case
as indicated above.

[2] Although neither the ALJ's decision nor the parties' briefs reference an application for disability insurance benefits
("DIB"), the administrative record reflects that the plaintiff may have also applied for DIB. (*See* Tr. 113 (reflecting
that the plaintiff's Request for Hearing noted that the plaintiff "appeals both the SSI and SSDI denial.")).

October 28, 2016, the plaintiff requested a hearing before an Administrative Law Judge ["ALJ"]. (Tr. 113).

On March 27, 2018, a video conference hearing was held before ALJ Jason Mastrangelo, at which the plaintiff, Ms. Yvette Wall, the plaintiff's sister, and Mr. Albert J. Sabella, a vocational expert ("VE"), testified. (Tr. 33-71). The plaintiff, his attorney, and both witnesses appeared in New Haven, Connecticut, while the ALJ presided over the hearing from Providence, Rhode Island. (Tr. 35). The ALJ issued an unfavorable decision on April 30, 2018, denying the plaintiff's claims for benefits. (Tr. 12-26). The plaintiff appealed to the Appeals Council, which, on November 27, 2018, denied the plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-5).

On January 26, 2019, the plaintiff filed his complaint in this pending action. (Doc. No. 1). The parties consented to the jurisdiction of a United States Magistrate Judge on February 5, 2019, and this case was transferred to the undersigned. (Doc. No. 10). On March 27, 2019, the defendant filed the administrative transcript. (Doc. No. 11). On May 28, 2019, the plaintiff filed his Motion to Reverse the Decision of the Commissioner (Doc. No. 13), with a Statement of Material Facts (Doc. No. 13-1), and brief in support (Doc. No. 13-2 ("Pl.'s Mem.")). On July 31, 2019, the defendant filed his Motion to Affirm (Doc. No. 14), with a Statement of Material Facts (Doc. No. 14-2), and brief in support. (Doc. No. 14-1 ("Def.'s Mem.")).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 13) is GRANTED, and the defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 14) is DENIED.

## II.    FACTUAL BACKGROUND

### A.    MEDICAL HISTORY

The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in their respective Statements of Material Facts (Doc. Nos. 13-1, 14-2). On September 2, 2011, the plaintiff was involved in a severe motorcycle accident. (Tr. 1283-84, 1290). He hit a wall at a high rate of speed and was thrown 30 feet from his motorcycle. (Tr. 630, 1284). As a result of the accident, he fractured his skull, multiple facial bone structures and vertebral bodies in his cervical and thoracic spine; he sustained hip lacerations, broken ribs, contusions, a collapsed right lung and abrasions to his chest, right wrist, left and right knees, left elbow, and forehead. (Tr. 652-57, 676, 905, 1281). The plaintiff claims that he became disabled as a result of injuries stemming from this accident, as well as other related impairments. The Court has reviewed the plaintiff's entire medical history, but cites only the portions of the record that are necessary to explain this decision.[3]

### B.    HEARING TESTIMONY

At the March 27, 2018 hearing, the plaintiff was 53 years old. (Tr. 39). He testified that he had completed "[m]aybe one year of college" and had not worked or received any income of his own since his September 2, 2011 accident. (Tr. 39-40). He lived with his sister and her husband. (Tr. 40-41). When asked whether he had difficulty cooking, cleaning, or doing laundry, the

---

[3] The plaintiff submitted medical records beginning on September 2, 2011. The relevant time period for the plaintiff's claim for SSI is the date when he filed his application for SSI through the date of the ALJ's decision; *see Stergue v. Astrue*, No. 3:13-CV-25 (DFM), 2014 WL 12825146, at *2 (D. Conn. May 30, 2014) (citing *Pratt v. Astrue*, No. 3:10-CV-413 (CFD), 2011 WL 322823, at *3 (D. Conn. Jan. 28, 2011)); which, for this case, is between December 30, 2015 and April 30, 2018. Nevertheless, medical records from before December 30, 2015 may be relevant to the extent that they provide information relative to whether he was disabled on or after December 30, 2015. *See DeChirico v. Callahan*, 134 F.3d 1177, 1184 (2d Cir. 1998) (finding that the ALJ was required "not only to develop [the plaintiff's] complete medical history for at least the twelve-month period prior to the filing of his application, but also to gather such information for a longer period if there was reasonable to believe that the information was necessary to reach a decision"); *see also* 20 C.F.R. § 416.1450(d)(1)).

plaintiff answered yes, and stated that he does not "remember a lot of things, so [his sister] prefers [he doesn't] cook too much" or "things like that." (Tr. 40). He also answered affirmatively when asked whether he loses things a lot. (Tr. 41 ("If I -- yes, I do. A lot of times I don't remember.")). The plaintiff would typically spend most of the day inside his home. (*Id.*). He also testified that he had a driver's license and could drive "a short period, maybe" before "get[ting] tired." (Tr. 40).

The plaintiff testified that it took him "awhile to really get up" because of pain and because he did not have "energy, anything," so he did not "do too much." (Tr. 42-43). He testified that he needed someone to remind him to take his medication and to go to his appointments. (Tr. 43-44). Indeed, if he had not had a ride to the hearing before the ALJ, he would not have remembered to go. (Tr. 44). When the ALJ asked the plaintiff whether he had "some sort of an accident that led to the problems that you have now," he first answered, "I don't understand what you mean." (Tr. 41). The ALJ then asked, "Have you ever had any certain injuries? Did you ever have a car accident or a fall? Were you ever taken injury to the head, anything like that?" (*Id.*). The plaintiff then answered, "Not, no, not since this I don't – no. Can't remember any." (*Id.*).

The plaintiff's attorney then questioned him. The plaintiff testified that he had "a lot of headaches," which involve "shooting pain down [his] left side from [his] neck that . . . seems to numb [him] at times." (Tr. 44). He had headaches "constantly" that last "for a while, hours," with the level of pain rated as an eight out of ten. (Tr. 45-46). When he had a headache, he needed to sit or lie down in a room with no lights or noise. (Tr. 46). He again testified about his memory problems, his frequent bouts of dizziness and his regular nightmares. (Tr. 44-45). He explained that he did not "sleep well without [his] medication." (Tr. 45). He also testified that he had "a bad, bad humming in [his] head" that "doesn't go away," "a buzzing sound that never leaves [his] head." (*Id.*). When asked about his balance, the plaintiff testified that he had problems moving

around "sometimes"; "maybe at least once, twice a week maybe," he was "very unbalanced and [he] [had] to just sit down or lay down." (Tr. 46-47). He also had trouble walking because he had a "hard time breathing." (Tr. 47). He spent "a lot" of the day resting. (Tr. 48).

The plaintiff additionally testified regarding numbness and shooting pain down his arms. (*Id.*). He explained that he could not lift things because he had "shooting pain down [his] arms, so [he] [had] no real strength." (*Id.*). He also had trouble getting dressed, "fell down a couple of times just putting on [his] . . . pants" and had to "sit down to put everything on, or try, or somebody else will." (Tr. 49). He had trouble standing because pain "shoot[s] down [his] left leg, . . . back and . . . shoulder" and his "right side . . . [would become] numb." (*Id.*). He also had trouble using stairs due to dizziness and would sleep on the couch instead of in a bedroom. (Tr. 49). He did not go grocery shopping because he would "start getting nervous" and "[could not] do it." (Tr. 50). He did not know how to use a computer and did not use a smart phone. (Tr. 51 ("I've tried, but I can't operate it. I don't understand –")). He also had trouble holding onto things, although he could not remember the different things he had dropped. (*Id.*). He explained that his hands would shake, causing him to cut himself with a razor or drop things. (Tr. 51-52). He liked watching television because he could sit down and relax while watching it. (Tr. 52).

The plaintiff's sister, Yvette Wall, also testified. Ms. Wall first stated that she agreed with the plaintiff's testimony regarding his problems with memory, concentration, fatigue, pain, and difficulty doing things around the house. (Tr. 55). She explained that her brother had not been the same since his accident and that her and her husband were his "constant caretakers." (Tr. 55-56). They needed to "lay [his] medicines out" and "remind him of [his] medicines." (Tr. 56). They also would drive him to "all of his appointments" because he "d[id] not own a car," and she would not let him drive her car. (*Id.*). She could not remember the last time he drove. (Tr. 60). They did not

let him cook because he had left on the stove in the past. (Tr. 56). When asked whether the plaintiff had developed any social problems after the accident, Ms. Walls testified that he was "introverted from what he used to be because it's difficult for him to carry on a conversation." (Tr. 57-58). She explained that he had "no short-term memories" and "[his] stuttering is a huge communication barrier." (Tr. 58). She had observed him laying down "probably two to three hours a day" because of "dizziness" and "headaches." (Tr. 61). She explained that he had dizzy spells "when things are in motion," such as in the elevator, or if "he moves too fast." (Tr. 62). His "mobility [was] different," "stiffened," and his "reaction time" had changed. (Tr. 64).

Mr. Albert Sabella, a VE, also testified. The ALJ asked the VE to assume a hypothetical individual, of the plaintiff's age, education and work experience,[4] limited to the medium exertional level, with sitting, standing, and walking for six hours at a time, frequent ramps and stairs, occasional ladders, ropes and scaffolds, and frequent stooping, kneeling, crouching, and crawling. (Tr. 66-67). The hypothetical individual would also have to avoid concentrated exposure to hazardous machines and have no exposure to heights. (Tr. 67). The ALJ then asked whether there are any representative occupations in the national economy that could be performed with such restrictions. (*Id.*). In response, the VE identified hand packer, with 250,000 jobs in the national labor market, and cleaning jobs, with 200,000 jobs in the national labor market. (*Id.*). The ALJ then asked whether "full-time, competitive employment" would exist if the hypothetical individual described above was limited to lifting and carrying ten pounds occasionally and less than ten

---

[4]The record includes very little detail about the plaintiff's past employment. A review of the record reveals previous earnings from Ultimate Concrete, Arrow Paper Equipment Rental, National Benefit Company, Labor Ready Northeast, Connecticut Concrete Construction, North American Construction and Holiday Hill Management Company. (Tr. 198-99, 204, 207). Neither the plaintiff nor the VE testified with specificity regarding the plaintiff's past employment, nor did the ALJ's decision provide more information. (*See* Tr. 24 (noting that the work performed by the plaintiff in 2002 was substantial gainful activity, but otherwise not addressing the specifics of the plaintiff's past employment)).

pounds frequently, and was unable to sit, stand or walk eight hours total over an eight-hour workday. (*Id.*). The VE answered that no "competitive employment" would exist for such an individual. (*Id.*). The ALJ then asked whether "full-time, competitive employment" would exist for someone unable to tolerate customary work pressure (attendance, persistence, pace or productivity) due to physical, cognitive, or emotional difficulties. (*Id.*). The VE answered that an individual unable to meet "any competitive standards" would not be employable. (Tr. 68).

The VE also testified that two or more absences each month would preclude sustainable employment, and that off-task behavior for more than fifteen percent of the work-day would preclude sustainable employment (*Id.*). The VE confirmed that an individual who needed to be off-task for ten to fifteen minutes each hour would be "well [below] any competitive standard or employer acceptability," and that an individual who was unable to maintain attention and concentration to complete even simple tasks consistently over an eight-hour workday would not be employable. (Tr. 68-69).

III.    THE ALJ'S DECISION

Following the five-step evaluation process,[5] the ALJ found that the plaintiff had not engaged in substantial gainful activity since December 30, 2015, his application date. (Tr. 18,

---

[5] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 416.920(a). First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 416.920(b). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 416.920(c). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. §§ 416.920(d), 416.925, 416.926; *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 416.909; *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 416.920(g). If the claimant shows he cannot perform his former work, as a fifth step, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 416.920(g); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

citing 20 C.F.R. § 416.971 *et seq.*). The ALJ noted that SSI is not "payable prior to the month following the month in which the application was filed," (Tr. 16, citing 20 C.F.R. § 416.335), but he still considered the plaintiff's complete medical history, including all of the medical records from after the September 2011 motorcycle accident and before the December 30, 2015 application date, consistent with 20 C.F.R. § 416.912(d).

At steps two and three, the ALJ concluded that the plaintiff had the severe impairments of asthma and a seizure disorder, (Tr. 18, citing 20 C.F.R. § 416.920(c)), but that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20, citing 20 C.F.R. §§ 416.920(d), 416.925 and 416.926). Specifically, the ALJ concluded that the plaintiff's asthma did not meet Listing 3.03 (Asthma), and that the plaintiff's seizure disorder did not meet Listing 11.02. (*Id.*).

At step four, the ALJ found that, "[a]fter careful consideration of the entire record," the plaintiff had the residual functional capacity ["RFC"] to perform medium work, as defined in 20 C.F.R. § 416.967(c), "in that the [plaintiff] c[ould] lift and/or carry 50 pounds occasionally and 25 pounds frequently," "stand and/walk six hours in an eight-hour workday," "sit six hours in an eight-hour workday," "frequently climb ramps and stairs," "occasionally climb ladders, ropes, and scaffolds," "frequently stoop, kneel, crouch, and crawl," and "must avoid concentrated exposure to hazardous machines and to heights." (Tr. 21). The ALJ then concluded that the plaintiff was not capable of performing his past relevant work. (Tr. 24, citing 20 C.F.R. § 416.965).

Finally, at step five, the ALJ found that the plaintiff was 51 years old at the time the application was filed and, as such, was a younger individual. (Tr. 24 ,citing 20 C.F.R. § 416.963). The ALJ stated that the plaintiff had at least a high school education and could communicate in

English. (*Id.*, citing 20 C.F.R. § 416.964). The ALJ found that transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that the plaintiff was not disabled, whether the plaintiff had transferable job skills. (*Id.*, citing SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2). The ALJ then concluded the plaintiff could perform the jobs of hand packager and cleaner and that they existed in significant numbers in the national economy. (Tr. 24-25, citing 20 CFR § 416.969 and 416.969(a)). Accordingly, the ALJ found that the plaintiff was not under a disability at any time from December 30, 2015, the date the application was filed, through April 30, 2018, the date of the ALJ's decision. (Tr. 25-26).

IV.     STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination was supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g).

Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez*

*v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Further, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.     DISCUSSION

The plaintiff contends that the ALJ erred in five respects: (1) the ALJ erred at steps two and three by failing to evaluate or improperly evaluating all of the plaintiff's impairments, and by failing to consider whether the plaintiff's impairments met or medically equaled the criteria of Listings 11.03 (Epilepsy), 11.04 (Vascular Insult), and 11.18 (Traumatic Brain Injury)[6]; (2) the ALJ failed to develop the record by not scheduling a consultative examination; (3) the ALJ erred in denying the plaintiff's request for an in-person hearing; (4) the ALJ's RFC determination was not supported by substantial evidence; and (5) the ALJ improperly rejected the testimony of the plaintiff's sister. For his part, the defendant argues that the ALJ properly weighed the plaintiff's impairments at step three, properly considered the plaintiff's various symptoms and impairments, fulfilled his duty to develop the record, reached an RFC assessment supported by substantial evidence, properly assessed the plaintiff's subjective statements as well as Ms. Wall's testimony, and was not required to accommodate the plaintiff's late request for an in-person hearing.

---

[6] Although the plaintiff cites Listing 11.03, the relevant Listings in effect at the time of the ALJ's decision were 11.02 (Epilepsy), 11.04 (Vascular Insult) and 11.18 (Traumatic Brain Injury). *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 11.02, 11.04, 11.18; 81 FR 43048 (Revised Medical Criteria for Evaluating Neurological Disorders, July 1, 2016) (effective as of September 29, 2016) ("We will begin to use this final rule on its effective date").

A.      THE ALJ'S FAILURE TO CONSIDER THE PLAINTIFF'S APHASIA, STUTTERING, DYSARTHRIA, DIZZINESS, AND MEMORY IMPAIRMENT

The plaintiff argues that the ALJ erred by not considering the plaintiff's aphasia, stuttering, dysarthria, dizziness, and memory impairment. (Pl.'s Mem. at 30-31).[7] The crux of the plaintiff's argument regarding these symptoms and impairments appears to be that the ALJ erred by failing to assess whether the plaintiff has a severe neurologic condition stemming from his 2011 motorcycle accident, and whether such condition met or medically equaled Listings 11.04 (Vascular Insult) or 11.18 (Traumatic Brain Injury).[8] (Pl.'s Mem. at 15-21). The defendant acknowledges that "the ALJ did not explicitly discuss these listings at step three," but argues that

---

[7] Preliminarily, the Court's review of the administrative record does not reveal any mention in the medical records of dysarthria. While the plaintiff states that, "[a]t the initial February 8, 2018 PT evaluation, social history was a patient with dysarthria and seizures secondary to TBI," (Doc. No. 13-1 at 20), the Court's review of the plaintiff's records from his February 8, 2018 physical therapy evaluation do not show any mention of dysarthria. (Tr. 1327, 1479). Accordingly, the ALJ did not err in failing to discuss dysarthria.

[8] Listing 11.04 (Vascular Insult) requires a showing of:

A.  Sensory or motor aphasia resulting in ineffective speech or communication persisting for at least 3 consecutive months after the insult; or
B.  Disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the insult; or
C.  Marked limitation in physical functioning and in one of the following areas of mental functioning, both persisting for at least 3 consecutive months after the insult:
   a. Understanding, remembering, or applying information; or
   b. Interacting with others; or
   c. Concentrating, persisting, or maintaining  pace; or
   d. Adapting or managing oneself.

Listing 11.18 (Traumatic Brain Injury) requires a showing of:

A.  Disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the injury; or
B.  Marked limitation in physical functioning, and in one of the following areas of mental functioning, persisting for at least 3 consecutive months after the injury:
   a.   Understanding, remembering, or applying information; or
   b.   Interacting with others; or
   c.   Concentrating, persisting, or maintaining pace; or
   d.   Adapting or managing oneself.

20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 11.04, 11.18.

the ALJ "clearly considered and discussed Plaintiff's traumatic brain injury and considered whether there was evidence of deficits resulting from his brain injury." (Def.'s Mem. at 6).

In his decision, the ALJ acknowledged that the plaintiff had "a medical history significant for head trauma and seizure disorder following a motor vehicle accident in 2011, resulting in cognitive difficulties." (Tr. 22). The ALJ then noted the following regarding the plaintiff's neurologic functioning: "[p]rimary care physician Dileema Kalansuriya, M.D.[] documented generally normal neurological findings from May 2012 through June 2017"; "[n]eurologist Robert Bonwetsch, M.D. reported no difficulty with concentration" and "noted intact speech, adequate knowledge and no evidence of remote or recent memory impairment"; "Dr. Khameneh observed that although the claimant stuttered, there was no evidence of aphasia"; "[n]eurological examination revealed full orientation, and intact cranial evidence, motor and sensation examination"; and the plaintiff's "recall was two out of three objects in three minutes; his concentration was three out of five; and he could do intersecting pentagon drawing correctly." (*Id.*). The ALJ also noted Dr. Khameneh's statement that "further neuropsychological evaluation and work capacity was necessary." (*Id.*).

A review of the plaintiff's medical records reveals that the ALJ erred in his consideration of the plaintiff's history of traumatic brain injury. As noted above, on September 3, 2011, the plaintiff was involved in a severe motorcycle accident, in which he sustained blunt trauma to the head. (Tr. 1283-84, 1290). A CT scan of the plaintiff's head that day revealed "[r]ight frontoparietal nondisplaced linear acute fracture and right orbit and right sphenoid bone acute fractures with minimal pneumocephalus, bilateral acute small subdural hematomas, right middle cranial fossa acute epidural hematoma, mild acute subarachnoid hemorrhage with left cerebral hemisphere edema with mild mass effect and 4 mm shift of midline structures to the right." (Tr.

688). The plaintiff had further CT scans on September 3, 4, 6, and 8, 2011 (Tr. 652-53, 682-83, 686-76, 701-02). He was discharged from the hospital on September 9, 2011. (Tr. 1281).

On September 11, 2011, the plaintiff presented at St. Mary's Hospital. (Tr. 1266). He had a battle's sign[9] on the right side of his head. (*Id.*). A CT scan of his head revealed "stable subacute bleeding that was consistent with the prior head trauma." (*Id.*). It showed "[s]table approximately 1.5 cm right temporal epidural hematoma," "[s]maller bilateral convexity subdural hematomas," "[h]emorrhagic contusion within the left temporal lobe with associated sulcal effacement and mild midline shift towards the right of 3 mm," "[s]ubdural hematoma along the falx and cerebellar tentorium," and "[c]alvarial and facial bone fractures." (Tr. 1275-76). A September 23, 2011 CT scan showed improvement: "[r]esolving hemorrhagic contusion within the left temporal lobe with decrease in edema and resolution of the previously noted midline shift," "[s]light interval decrease in size in the small left frontal subdural hematoma and stable small left pariela subdural hematoma," "[r]esolution of the . . . subdural hematoma along the falx and cerebellar tentorium," and resolution of the "right temporal epidural hematom."  (Tr. 676).

On November 9, 2011, the plaintiff presented to Dr. Kalansuriya complaining of memory and speech issues, as well as left hand and right shoulder pain. (Tr. 883-85). The plaintiff reported having "difficulty finding words at time"; "[h]e knows what he wants to say but has difficulty trying to come up with the exact word." (Tr. 883). He also reported short term memory loss. (*Id.*). Dr. Kalansuriya noted that the plaintiff "present[ed] with complaints of gradual onset of intermittent episodes of moderate aphasia, described as word finding difficulties and poor word translations." (*Id.*). Treatment notes reflect "memory loss" but "no confusion, no syncope, no dizziness and no numbness." (*Id.*). On January 19, 2012, the plaintiff saw Dr. Kalansuriya again.

---

[9] A battle's sign, or battle sign, is a bruise that indicates a fracture at the bottom of the skull. *What Is a Battle Sign?*, HEALTHLINE, https://www.healthline.com/health/battle-sign (last visited Feb. 13, 2020).

(Tr. 878-81). Treatment notes reflect that the plaintiff's aphasia "has improved"; his "word finding difficulty is improving, although he still has difficulty at times." (Tr. 878).

The plaintiff returned to Dr. Kalansuriya on February 28, 2012, after being admitted to the emergency room the day before for seizures. (Tr. 875-77). Treatment notes reflect "dizziness, but no headache, no confusion, no syncope and no numbness." (Tr. 875). A CT scan of the plaintiff's head from February 27, 2012 showed "[n]o acute intracranial hemorrhage or mass effect" and that the "[p]revious noted right temporal and parietal subdural and epidural hemorrhages . . . resolved." (Tr. 674). On March 13, 2012, the plaintiff saw Dr. Kalansuriya for a follow-up on his seizures. (Tr. 870-72).

On April 13, 2012, the plaintiff saw Dr. Robert Bonwetsch, M.D., for a neurological consultation regarding his post-traumatic epilepsy. (Tr. 630-32). On examination, the plaintiff had blurry vision, but did not show any decrease in concentrating ability, impairment of remote or recent memory, language abnormalities or deficit in his "fund of knowledge." (Tr. 631). Dr. Bonwetsch noted, however, that "the patient suffered a traumatic brain injury and if he continues to complain of cognitive problems a year later you could consider sending him for neuropsychological testing." (Tr. 632).

On December 24, 2012, the plaintiff was brought to the emergency room by EMS after he had passed out at a gas station and was found "stumbling and staggering" around. (Tr. 319-325). He did not remember what had happened. (Tr. 325). He was dizzy and disoriented. (Tr. 323). He was diagnosed with a "small abrasion/hematoma to the posterior scalp." (Tr. 320). A CT scan showed "no evidence of mass effect or hemorrhage and essentially no change since February 27, 2012. (*Id.*). The ER report noted that the plaintiff "may have missed a dose or two" of his seizure medications. (*Id.*).

On April 13, 2013, the plaintiff was admitted to the emergency room after experiencing a seizure. (Tr. 329). He had not taken his normal dose of anti-seizure medicines. (*Id.*). Dr. Bonwetsch treated the plaintiff on May 24, 2013 for post-traumatic epilepsy, sleep problems, and fatigue. (Tr. 633). The plaintiff had blurry vision, but no difficulty walking, no tingling, and no numbness. (Tr. 634). Dr. Bonwetsch did not observe any "decrease in [the plaintiff's] concentrating ability," his remote and recent memory were not impaired, he demonstrated an adequate fund of knowledge, and he had no language abnormalities. (*Id.*).

In October 2014, the plaintiff reported to Dr. Kalansuriya that he had been having memory issues since the accident which made it difficult for him to hold a job. (Tr. 1082). Treatment notes reflect that the plaintiff was "very frustrat[ed]" by his memory issue, which "impact[ed] his ability to concentrate on his work, household activities as well [as] focus on the job at hand." (Tr. 1077). Treatment notes from November 10, 2014 similarly reflect that the plaintiff's "short term memory loss [was] an issue." (Tr. 1070-72). Dr. Kalansuriya noted that she would "try to arrange for neurocognitive testing" and that the plaintiff should follow up with a neurologist. (Tr. 1074). No further appointments with a neurologist appear to have occurred at this time.

The plaintiff did not see a physician for any of these issues again until October 2017. On October 18, 2017, the plaintiff saw Dr. Behzad Habibi Khameneh, M.D., a neurologist. (Tr. 1345-47). He told Dr. Khameneh that "his memory is not as good as before [his] accident"; he stated that "he d[id] not remember most of the things that happen[ed] around him," "he ha[d] difficulty with his speech," and "he g[ot] confused at times." (Tr. 1346). A neurological examination found that the plaintiff's recall was two out of three objects in three minutes, his concentration was three out of five, he could do an intersecting pentagon drawing correctly, and his naming was intact. (*Id.*). Dr. Khameneh noted that he stuttered during the examination but had no aphasia. (*Id.*). Dr.

Khameneh concluded that the plaintiff suffered from epilepsy secondary to a traumatic brain injury. Dr. Khameneh told the plaintiff that he needed to send him for a neuro-psychological evaluation and work-capacity evaluation before completing his disability papers.

That same day, the plaintiff saw Dr. Kalansuriya. (Tr. 1388-92). The plaintiff reported "increasing headaches, memory issues [and] low mood which is affecting his functionality." (Tr. 1388). He had "confusion and dizziness." (*Id.*). On November 22, 2017, the plaintiff went to the neurology clinic at Danbury Hospital. (Tr. 1366). The treatment notes are unclear as to which physician saw the plaintiff but reflect that the plaintiff reported worsening memory loss and confusion. (*Id.*).

Thus, a review of the plaintiff's medical history reveals that a remand is warranted for the ALJ to consider whether the plaintiff has a neurologic condition that meets or medically equals Listings 11.04 (Vascular Insult) and 11.18 (Traumatic Brain Injury) and to evaluate the plaintiff's stuttering, aphasia, memory impairment, and dizziness stemming from his traumatic brain injury in formulating his RFC.

As to the plaintiff's stuttering, Dr. Khameneh noted that he stuttered during the October 18, 2017 examination. (Tr. 1347). Ms. Walls testified at the plaintiff's hearing that "the [plaintiff's] stuttering is a huge communication barrier." (Tr. 58). The ALJ, however, did not mention stuttering in his decision.

As to the plaintiff's aphasia, the record reflects that the plaintiff complained of aphasia on November 9, 2011, (Tr. 883-85), and that on January 19, 2012, it had improved but he still had difficulties. (Tr. 878). The plaintiff complained of dizziness to Dr. Kalansuriya on February 8, 2012 and October 18, 2017. (Tr. 875, 323). He also complained of dizziness on December 24,

2012, when he was brought to the emergency room by EMS after he had passed out at a gas station and was found "stumbling and staggering" around. (Tr. 319-325).

Finally, as to the plaintiff's memory, the record reflects that the plaintiff reported short term memory loss in November 2011, (Tr. 883-85), October 2014, (Tr. 1082), November 2014, (Tr. 1070-72), October 2017 (Tr. 1345-47, 1388), and November 2017 (Tr. 1366). On April 13, 2012, Dr. Bonwetsch, a neurologist, noted that "the patient suffered a traumatic brain injury and if he continues to complain of cognitive problems a year later you could consider sending him for neuropsychological testing." (Tr. 632). In October 2014, the plaintiff reported to Dr. Kalansuriya that he had been having memory issues since the accident. (Tr. 1082). In November 2014, Dr. Kalansuriya noted that he should follow up with a neurologist. (Tr. 1074). In October 2017, the plaintiff told Dr. Khameneh that "his memory is not as good as before [his] accident"; he stated that "he d[id] not remember most of the things that happen[ed] around him." (Tr. 1346). A neurological examination found that the plaintiff's recall was two out of three objects in three minutes and his concentration was three out of five. (*Id.*). Dr. Khameneh told the plaintiff he needed to send him for a neuro-psychological and work capacity evaluation. (Tr. 1388).

Therefore, a remand is warranted because, in addition to the medical records reflecting consistent reporting of memory and speech issues since the plaintiff's motorcycle accident, three of the plaintiff's treating physicians indicated that the plaintiff should undergo further neuropsychological testing. (Tr. 632, 1074, 1388). Though many of these records predate the relevant period in this matter, beginning in October 2017, the medical records reflect continued reports of memory issues, stuttering, and confusion. Further, Dr. Khameneh recommended a neuro-psychological and work capacity evaluation in October 2017. These records support the plaintiff's assertion that he may satisfy the criteria of Listings 11.04 and 11.18, specifically, the

requirements of marked limitation in physical functioning and one of the areas of mental functioning. Despite these records and statements, the ALJ did not evaluate whether the plaintiff had a neurologic condition that met Listings 11.04 (Vascular Insult) or 11.18 (Traumatic Brain Injury), nor did he include any limitations based on memory or speech impairment in the plaintiff's RFC. Further, the plaintiff's testimony—as well as the testimony of Ms. Walls—revealed that the plaintiff had trouble remembering to take his medications, interacting with others, and completing other activities of daily living due to issues with his memory and speech. (Tr. 40-41, 44, 56-58). In light of the medical records, physician statements, and testimony suggesting a neurologic injury, the ALJ should have considered whether the plaintiff's impairments met the criteria for Listings 11.04 and 11.18.

B.       THE ALJ'S FAILURE TO CONSIDER THE PLAINTIFF'S HEADACHES

The plaintiff bears the burden of establishing that he has a medically determinable impairment, which "can be shown by medically acceptable clinical and laboratory diagnostic techniques[]" from an "acceptable medical source." 20 C.F.R. § 416.921. After a medically determinable impairment is established, the Commissioner determines at step two of the sequential analysis whether the impairment is "severe." *Id.*; *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d Cir. 2015). In order for an impairment to be "severe" the impairment must "significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.922. In other words, the impairment must have "more than a minimal effect on an individual's physical or mental ability(ies) to do basic work activities[.]" Social Security Ruling ["SSR"] 85-28, 1985 WL 56856, at *3 (S.S.A. Jan. 1, 1985). Moreover, the Social Security Regulations include a "duration requirement[]" that an impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 416.909.

Here, the plaintiff complained of headaches after his accident on September 3, 2011, (Tr. 659-660), and was diagnosed with post-concussive headaches on September 11, 2011. (Tr. 1264-66). Treatment notes from November 2011 reflect that the plaintiff continued to experience headaches. (Tr. 882-885). In January 2012 and March 2012, the plaintiff reported headaches. (Tr. 878-881, 870-72). On January 6, 2015, the plaintiff complained of headaches. (Tr. 927-30). Treatment notes reflect that the headaches have been "[]chronic, since accident[]." (*Id.*). The plaintiff complained of chronic headaches again on February 12, 2015. (Tr. 1052). On August 15, 2016, the plaintiff presented at the emergency room complaining of headaches beginning after a "fall down [a] staircase 1 week ago." (Tr. 593, 595-96). A week later, on August 24, 2016, the plaintiff saw Dr. Kalensuriya and reported that "the headaches ha[d] improved." (Tr. 978-81).

On July 10, 2017, the plaintiff reported that he had "headaches that ha[d] been happening more frequently in the recent past." (Tr. 1338). He described the headaches as "pain invol[ving] the entire head" which had "been happening at least several times weekly." (*Id.*). Treatment notes from October 12, 2017 reflect a similar complaint. (Tr. 1395, 1400, 1413). At that time, Dr. Kalansuriya indicated that the plaintiff's headaches had "[gotten] worse," "are a daily occurrence," and "[are] impacting his quality [of] life and well being significantly." (Tr. 1400). In February 2018, the plaintiff's physical therapist noted that "severe headache[s]" were among the plaintiff's chief complaints. (Tr. 1327-28). The plaintiff did not list "headaches" in his disability benefits application. (Tr. 95-98, 72-81). The plaintiff and his sister, however, both testified regarding the plaintiff's chronic headaches at the March 27, 2018 hearing. (Tr. 44-46, 61).

The ALJ should have considered the plaintiff's headaches in his step two determination of the severity of the plaintiff's impairments and their impact on his physical and mental ability to perform basic work activities. The Regulations assure a claimant that the Social Security

Administration will consider all the evidence presented on a claimant's physical and mental limitations when making a disability determination. *See Warren v. Astrue*, No. 09-CV-6217, 2010 WL 2998679, at *2 (W.D.N.Y. Jul. 27, 2010) (remanding where the ALJ did not consider the plaintiff's diagnosed personality disorder). Further, though an ALJ's error at step two may be harmless where the condition "w[as] considered during the subsequent steps," *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (summary order), here, the ALJ did not mention the plaintiff's headaches once in the decision, "let alone state a conclusion regarding [their] severity." *Warren*, 2010 WL 2998679, at *2. Therefore, remand is warranted. Upon remand, the ALJ shall evaluate whether the plaintiff's headaches meet or medically equal the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

C.   THE SEVERITY OF THE PLAINTIFF'S HEMOCHROMATOSIS AND CERVICAL SPINE IMPAIRMENT

The plaintiff argues that the ALJ should have found, under step two, that his hemochromatosis and cervical spine impairments were severe impairments. (Pl.'s Mem. of Law, at 30-32). The Court agrees with the plaintiff that the ALJ's non-severity finding was not the result of proper application of the correct legal principles.

"[T]he standard of a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). An impairment is "severe" if it "significantly limits [the plaintiff's] ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities include, among others, physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying and handling. *See* 20 C.F.R. § 404.1522(b)(1). The plaintiff bears the burden of establishing that an impairment is severe. *See Woodmancy v. Colvin*, 577 F. App'x 72, 74 (2d Cir. 2014) (summary order) (citing *Green-Younger v. Comm'r*, 335 F.3d 99, 106 (2d Cir. 2003)).

Taking each impairment in turn, Dr. Sharon Hall first diagnosed the plaintiff's hemochromatosis[10] on April 28, 2015. (Tr. 760-61). As noted by the ALJ, the plaintiff received phlebotomies for this condition to lower his iron levels. (Tr. 18; 431-36, 448-92, 718-828). Contrary to the plaintiff's argument, nothing in the objective tests or treatment notes support the plaintiff's assertion that he needed two days of rest after each phlebotomy. However, the record does reflect potential limitations. The plaintiff reported "feeling tired" in July 2015, (Tr. 458), "fatigue" in November 2015, (Tr. 450), and "reduced energy" in January 2016. (Tr. 448). Moreover, while Dr. Hall opined in April 2016, July 2016, October 2016, and April 2017 that the plaintiff was "fully active and able to carry on all pre-disease performance without restriction," (Tr. 723,-24, 744, 750-51, 755-56), in December 2016, she opined that the plaintiff was "restricted in physically strenuous activity but ambulatory and able to carry out work of a light or sedentary nature, *e.g.*, light house work, office work." (Tr. 735-36). In his decision, the ALJ does not reference Dr. Hall's December 2016 statement, which indicated that the plaintiff's hemochromatosis could affect his ability to perform consistently basic work-related activities. Instead, the ALJ cited Dr. Hall's April 2017 statement for the conclusion that the impairment caused no more than minimal limitations in the plaintiff's ability to perform work activities. (Tr. 18). Given all of Dr. Hall's statements, the ALJ should have considered whether the plaintiff's hemochromatosis could have resulted in limitations.

Additionally, the ALJ erred in evaluating the plaintiff's cervical spine impairment. The ALJ found that this impairment was "nonsevere" because it did not cause more than "minimal limitations" in the plaintiff's ability to perform work activities. (Tr. 19). In evaluating this

---

[10] Hemochromatosis is a condition that causes the body to absorb too much iron. *Hemochromatosis*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/hemochromatosis/symptoms-causes/syc-20351443 (last visited Feb. 13, 2020).

impairment, the ALJ noted that "the record shows evidence of cervical spine spondylosis treated with physical therapy in November 2017," but "the [plaintiff] did not actively participate" in physical therapy, and the record did not include any "radiological studies." (*Id.*). Also, the ALJ noted that a "CT of the cervical spine in January 2018 revealed minimal interval progression of spondylotic changes,"[11] since 2011, and the plaintiff's "physician has not imposed any restrictions on his activities because of this impairment." (*Id.*).

The medical records do not support the ALJ's finding of nonseverity. An MRI of the plaintiff's cervical spine performed on September 23, 2011 revealed mild cord compression at the C5-6 level due to moderate central spinal stenosis. (Tr. 901-02, 1450-51). On August 25, 2016, the plaintiff presented to Dr. Kalansuriya complaining of pain radiating into his neck. (Tr. 978). On December 15, 2017, the plaintiff complained of numbness and tingling in his right arm. (Tr. 1359). His range of motion in his right shoulder was restricted. (Tr. 1363). Dr. Kalansuriya ordered cervical spinal x-rays to assess cervical radiculopathy. (Tr. 1364). An MRI of the plaintiff's cervical spine on January 16, 2018 revealed "straightening of the normal, cervical lordotic curvature, possibly due to combined muscle spasm and multilevel spondylosis," "no acute vertebral compression fracture or subluxation," and "interval progression of degenerative changes, now with moderate C5-C6 and C6-C7 disc space loss, endplate sclerosis, osteophytic ridging, and bilateral uncovertebral joint hypertrophy." (Tr. 1358). The January 2018 MRI thus revealed "[i]nterval progression of spondylotic changes" since the plaintiff's last MRI. (*Id.*).

Moreover, the plaintiff attended physical therapy at Access Rehabilitation Centers from February 8, 2018 through March 26, 2018. (Tr. 1327-28, 1438-1448, 1455-56, 1459-60, 1463-

---

[11] Spondylosis refers to degenerative changes in the spine, which are frequently referred to as osteoarthritis. *Spondyslosis*, EMEDICINEHEALTH, https://www.emedicinehealth.com/spondylosis/article_em.htm (last visited Feb. 19, 2020).

79).[12] The referral was for cervical spine pain radiating to the upper extremities with occasional lower extremity spasms. (Tr. 1327). Treatment notes reflect that the plaintiff's pain increased with "prolonged static postures," (*Id.*), and his physical therapist noted him to be a "fall risk." (Tr. 1328). His range of motion was restricted, and his upper extremity strength was limited. (Tr. 1327-28).

Thus, both treatment notes and diagnostic evidence suggest limitations in the plaintiff's ability to do basic work activities, such as standing and walking for periods of time, and in the plaintiff's strength in his upper extremities. The ALJ did not address these portions of the treatment notes. Further, the ALJ did not rely on a physician's opinion in finding that the plaintiff's cervical spine impairment was nonsevere. The ALJ did not cite to a physician's opinion in this section.[13] Instead, the ALJ's characterization of the medical evidence and his analysis reflects "a substitut[ion] of his own judgment for competent medical opinion[.]" *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (internal quotations and citations omitted). The Second Circuit has made it abundantly clear that an "ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." *Id.* By finding that the "medical evidence of record supports a finding that this impairment causes no more than minimal limitations in the [plaintiff's] ability to perform work activities," the ALJ made a medical determination of ability to work based on his own evaluation of the plaintiff's symptoms, not based on reported limitations of activity. Accordingly, given the *de minimis* standard, and because the ALJ's conclusion at step two with respect to the plaintiff's

---

[12] The plaintiff attended four physical therapy sessions, but he had the flu at two of the appointments. (Tr. 1470, 1472).

[13] The only medical opinions as to any impairments in the record were from the state agency physicians Dr. Henry Scovern, M.D. and Dr. Joseph Connolly, Jr., M.D., who did not personally examine the plaintiff and who did not base their opinions on the full medical record. As relevant here, the plaintiff's treatment for his cervical spine impairment continued through March 2018, while these physicians opined as to the plaintiff's RFC in April 2016 and July 2016, respectively. (Tr. 72, 80, 83, 92). Moreover, neither physician mentioned any cervical spine impairment, referring instead to "unspecified arthropathies." (*Id.*).

hemochromatosis and cervical spine impairment was not the result of proper application of the correct legal principles, this case must be remanded.[14]

D. REMAINING ARGUMENTS

The plaintiff also argues that the ALJ erred by (1) refusing to schedule a consultative examination; (2) denying the plaintiff's request for an in-person hearing; (3) making an RFC determination not supported by substantial evidence; and (4) improperly rejecting the testimony of the plaintiff's sister. Upon remand, the ALJ *may* ask the plaintiff to attend a consultative examination depending upon the sufficiency of the medical evidence provided. *See* 20 C.F.R. § 416.912(b)(2) ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests"). The necessity of such an examination, however, is an issue for the ALJ to evaluate upon remand. Additionally, the defendant shall afford the plaintiff an opportunity for an in-person hearing upon remand which is consistent with the regulation governing the timing of any request for an in-person hearing. *See* 20 C.F.R. § 404.936(d) ("If you object to appearing by video teleconferencing, you must notify us in writing within 30 days after the date you received the notice [scheduling the hearing]. If you notify us within that time period . . . we will set your hearing for a time and place at which you may [appear] in

---

[14] The plaintiff also argues, in one sentence, that the ALJ should have evaluated his fractured vertebrae, right shoulder AC separation, left wrist injury, limited range of motion of the upper extremities, multiple rib deformities, insomnia, and back pain. (Pl.'s Mem. at 30-31). The ALJ did not list these impairments in his decision. Preliminarily, nothing in the record supports a conclusion that the plaintiff's fractured vertebrae, right shoulder AC separation, limited range of motion of the upper extremities, or multiple rib deformities are "medically determinable impairments." *See* 20 C.F.R. § 416.921. Further, the Court's discussion of the plaintiff's cervical spine impairment above encompasses the plaintiff's "back pain." Additionally, as to the plaintiff's left wrist injury, though the plaintiff reported to Dr. Kalansuriya in January 2012 that he had "mild" and "intermittent" wrist pain, (Tr. 878), the medical records during the relevant period do not reflect complaints of wrist pain. Therefore, remand is not appropriate for these impairments. Finally, the record reflects that the plaintiff was consistently treated and prescribed medication for insomnia. (Tr. 534, 932, 939-44, 951-57, 990-95, 1070-74, 1065-69, 1084-88, 1117-18, 1153-59, 1338-43, 1395). The ALJ should consider this impairment and assess its severity upon remand.

person."). Finally, in light of the Court's ruling remanding the case to an ALJ for a *de novo* hearing, the Court need not address the plaintiff's arguments alleging error both in the calculation of the RFC and in the treatment of the testimony by the plaintiff's sister.

## VI.     CONCLUSION

For the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 13) is GRANTED such that this case is remanded for a *de novo* hearing before an ALJ and a new decision consistent with this ruling. The defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 14) is DENIED.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c). The Clerk's Office is instructed that, if any party appeals to this Court the decision made after this remand, any subsequent social security appeal is to be assigned to the Magistrate Judge who issued the Ruling that remanded the case.

Dated this 19th day of February, 2020 at New Haven, Connecticut.

  _/s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge